UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INTEGRITY KOKOSING PIPELINE SERVICES, LLC, | ) ) ) | |
| *Plaintiff* | ) ) | Cause No. 1:20-cv-2321-RLM-MG |
| v. | ) ) | |
| PIPELINERS UNION 798 UNITED ASSOCIATION, | ) ) ) | |
| *Defendant* | ) | |

ORDER

Integrity Kokosing Pipeline Services, LLC ("Kokosing"), sued Pipeliners Union 798 United Association ("Local 798") for violations of federal unfair labor practice laws and related Indiana state law claims. When Local 798 moved to dismiss Kokosing's complaint, Kokosing responded by amending its complaint, making the motion to dismiss moot. Local 798 then filed a second motion to dismiss based on Kokosing's amended complaint. Kokosing again amended its complaint, but this time the court didn't deny Local 798's motion to dismiss as moot, but instead accepted it as a motion to dismiss Kokosing's second amended complaint because Kokosing's unopposed motion for leave to amend advised the court that differences between the two complaints was minimal. For the following reasons, the court GRANTS IN PART AND DENIES IN PART Local 798's motion to dismiss [Doc. No. 35].

I.    BACKGROUND

The second amended complaint alleges the following facts. Kokosing is a construction company offering services related to the oil and natural gas industry, including pipeline construction. Local 798 is a labor union that represents workers in several states involved in pipeline construction, maintenance, and system upgrades.

In July 2012, Kokosing signed two different National Pipeline Agreements—one with the International Union of Operating Engineers and one with the International Laborers—assigning its pipeline work to employees represented by those labor unions. Six years later, between May and August 2018, Local 798 representatives repeatedly demanded that Kokosing sign a collective bargaining agreement with them that would effectively take work away from the other two labor unions and reassign it to Local 798 workers. The proposed agreement violated federal law. Kokosing declined, and in August 2018, Kokosing signed a collective bargaining agreement with Operating Engineers Locals 18, 18S, and 132 ("Operating Engineers"), assigning to them the welding work that Local 798 had demanded be assigned to Local 798 workers.

When Local 798 learned of Kokosing's collective bargaining agreement with Operating Engineers, it picketed Kokosing projects and corresponded with TransCanada, one of Kokosing's customers, about TransCanada ceasing to do business with Kokosing. Local 798 did this in an effort to coerce TransCanada to stop doing business with Kokosing. In September 2018, Kokosing corresponded with TransCanada about whether it could still bid on work for

TransCanada. The next month, Local 798 wrote articles in Blue Light Report Central saying that Local 798's picketing of Kokosing caused TransCanada to stop doing business with Kokosing and to only use contractors whose employees were represented by Local 798. Nine months later in July 2019, Kokosing learned that Local 798's representations in Blue Light Report Central were correct and that, because of Local 798's picketing and other conduct, TransCanada would no longer do business with Kokosing. Kokosing suffered damages nearing $1 million in August and September 2018 on the Line 0-731 Bare Steel Project alone, and at least $19,298,400 over a three-year period from TransCanada's ceasing to do business with it.

Around April 2020, Kokosing began a project for Vectren Energy in Dayton, Ohio. A Local 798 representative soon called Vectren and stated (falsely, according to the complaint) that Kokosing couldn't deliver on-time, safe, quality work and that Kokosing's welders were unsafe and unskilled. These statements were made to coerce Vectren to stop doing business with Kokosing. Kokosing uses trained and certified welders who produce safe and quality work, and Local 798 knew that Kokosing delivered quality work based on their welders' certifications and examinations of Kokosing's welders' work through x-ray and pressure testing. Local 798's conduct caused Kokosing damages, including lost and delayed work, additional staffing costs, and additional administrative costs.

On July 6, 2020, Kokosing began a project for Panhandle Eastern ("Panhandle") in Indianapolis, Indiana. A Local 798 representative called Panhandle the same day and said that Kokosing's welders weren't qualified to

weld. Seven days later, Local 798 started disseminating a flyer claiming that Kokosing used unskilled welders and other workers, and that Kokosing's welders performed unsafe work. A Local 798 representative posted this flyer to his personal LinkedIn page and commented that Kokosing used "untrained workers." These statements were made to coerce Panhandle to stop doing business with Kokosing. Again, the complaint alleges that Local 798 knew these statements were false because it knew of the training Kokosing's welders receive, and that only certified welders who are tested on the project are permitted to work on the project.

Kokosing's counsel notified Local 798 that its flyers were false and defamatory and asked it to retract the flyers and refrain from defamatory conduct. Local 798 responded that it would cease its conduct if Kokosing would reassign its work away from Operating Engineers and give it to Local 798. Kokosing rejected Local 798's demands, and Local 798 resumed their conduct. On July 13, 2020, Local 798 posted on the internet a public letter to Vectren claiming that Kokosing used unskilled and unsafe welders. Eleven days later, Local 798 disseminated more flyers and a Local 798 representative posted a flyer on his public Facebook page claiming that Kokosing used unskilled and unsafe welders, suggesting that the public should call Panhandle to protest Kokosing's unskilled welders. They also contacted Panhandle directly and told them themselves that Kokosing uses non-skilled tradesmen. As a result, Kokosing suffered damages totaling at least $191,000.

On July 27, 2020, Local 798 disseminated the same flyer regarding a Vectren project in Dayton, Ohio, and taped it to Vectren's main office door. Local 798 also called Panhandle again telling them that Kokosing used unskilled welders and substandard product to be installed. They also threatened to call OSHA, claiming that Kokosing wasn't following federal safety guidelines on the project but instead was violating federal safety standards and was going to get someone killed on the job. These statements were made to coerce Vectren and Panhandle to stop doing business with Kokosing. Local 798 had no basis for making that claim. This might have been the same Vectren project already discussed, but the complaint isn't clear.

On August 12, 2020, a Local 798 representative posted a video on his public Facebook page of a leaking pipe suggesting that Kokosing welders were at fault even though the representative knew that the video wasn't of a Kokosing project. The next month, a different Local 798 representative wrote an article in Blue Light Report Central saying that Local 798's efforts to dissuade customers from using Kokosing were working. The article inaccurately stated that Kokosing had high repair rates, missed deadlines, and had a bad safety record.

Kokosing brought this lawsuit against Local 798 in September 2020 and filed its second amended complaint in February 2021, alleging violations of Section 303 of the Labor Management Relations Act and Indiana state-law claims for defamation and interference with business relationships and expectancies. Since then, the parties have partially settled and Kokosing has agreed to dismiss the individual defendants. Still pending before the court is Local 798's motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.   LEGAL STANDARD

"When considering a defendant's motion to dismiss, [the court] view[s] the complaint's allegations in the light most favorable to the plaintiff. [The court] take[s] as true all well-pleaded facts and allegations in the plaintiff's complaint, . . . and the plaintiff is entitled to all reasonable inferences that can be drawn from the complaint." Bontkowski v. First Nat. Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Factual allegations must give the defendant fair notice of the claims being asserted and the grounds upon which they rest and "be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. In other words, a complaint must give "enough details about the subject-matter of the case to present a story that holds together." McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011). A pleading that merely offers "labels and conclusions" or "a formulaic recitation

of the elements of a cause of action will not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.

### III.   DISCUSSION

Kokosing's complaint asserts six counts against Local 798. Counts 1-4 are for different violations of Section 303 of the Labor Management Relations Act, Count 5 is for defamation under Indiana state law, and Count 6 is for tortious interference with business relationships and expectancies under Indiana state law.

### A.  *Labor Management Relations Act Section 303 Claims*

Section 303 of the Labor Management Relations Act makes it "unlawful, . . . in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title." 29 U.S.C. § 187(a). Section 158(b)(4) contains various unfair labor practices that a union could commit. 29 U.S.C. § 158(b)(4). Counts 1-4 of Kokosing's complaint bring claims under subsections 158(b)(4)(ii)(A)-(D), respectively.

#### 1.  *Threatening, Coercive, or Restraining Conduct*

Subsection 158(b)(4)(ii) provides a precondition for stating Section 303 claims that are outlined in subsections 158(b)(4)(ii)(A)-(D). Subsection 158(b)(4)(ii) makes it unlawful "to threaten, coerce, or restrain any person

engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . [situations covered by subsections (A)-(D)]." Local 798 argues that Kokosing can't state a claim upon which relief can be granted in Counts 1-4 under subsections (A)-(D) respectively because Kokosing can't establish that Local 798's conduct satisfies the condition precedent—that its conduct was threatening, coercive, or restraining with respect to Kokosing's relationships with its customers.

"The Supreme Court has held that courts should exercise 'caution' in interpreting the phrase 'to threaten, coerce, or restrain,' and not give the phrase a 'broad sweep.'" 520 S. Michigan Ave. Assocs, Ltd. v. Unite Here Loc. 1, 760 F.3d 708, 719 (7th Cir. 2014) (citing NLRB v. Drivers, Chauffeurs, Helpers, Local Union No. 639, 362 U.S. 274, 290 (1960)). Whether conduct was impermissibly coercive is a fact-bound inquiry that considers the union's entire course of conduct towards each target separately. Int'l Union of Operating Engineers, Loc. 150, AFL-CIO v. N.L.R.B., 47 F.3d 218, 223 (7th Cir. 1995); 520 S. Michigan Ave. Assocs, Ltd. v. Unite Here Loc. 1, 760 F.3d at 725-732 (analyzing the union's conduct toward each neutral separately and finding a reasonable inference of coercion for some neutral parties but not others); Ameristar Casino E. Chicago, LLC v. UNITE HERE Loc. 1, 2018 WL 4052150, at *5 (N.D. Ill. Aug. 24, 2018). "Coercion has both subjective and objective components; a neutral must believe that her 'only choice was to accede to the union's demands or else face substantial loss or ruin,' and her belief must be an objectively reasonable one, meaning that 'an ordinary person in her position would have felt coerced.'"

Ameristar Casino E. Chicago, LLC v. UNITE HERE Loc. 1, 2018 WL 4052150, at
*4 (citing 520 S. Michigan Ave. Assocs., Ltd. v. Unite Here Loc. 1, 760 F.3d at
725).

Regarding Vectren and Panhandle, Local 798 says that the complaint only
alleges conduct on their part that consists of leafleting and other forms of written
communication. This activity, they say, isn't the type of conduct that Section
158(b)(4)(ii) prohibits as a matter of law. Regarding TransCanada, Local 798 says
that the only instance in which Kokosing possibly alleges legally cognizable
coercive conduct is Local 798's picketing of the TransCanada project. But they
say that this isn't good enough because a Section 303 claim must also allege
actual damages, and Kokosing hasn't made such an allegation.

Labor unions may communicate with neutral parties to persuade
customers not to do business with an employer so long as the communications
don't constitute harassment. Id. at 722. Peaceful handbilling and persuading
managers of secondary businesses to not contract with primary employers "is
not an unfair labor practice and is squarely protected under the First
Amendment." Id. at 717 (citing DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr.
Trades Council, 485 U.S.  568 (1988)). And "a union delegation generally may
enter upon private property, even without prior permission, at least once for the
purpose of informing and persuading a decision-maker of a neutral entity not to
do business with a struck employer." Id. at 720; see also NLRB v. Servette, Inc.,
377 U.S. 46, 51 (1964). But conduct "'that reasonably can be expected to
threaten neutral parties with ruin or substantial loss' can constitute an unfair

labor practice because it is coercive." Id. at 719 (quoting NLRB v. Retail Store Emp. Union, Local 1001, 447 U.S. 607, 614 (1980)).

The complaint alleges that Local 798 called Vectren, leafletted a flyer, posted a flyer on Vectren's office door, and posted a flyer on the internet—all claiming that Kokosing had unskilled workers. Without more, these actions aren't enough to constitute coercive conduct under controlling precedent.

But regarding Panhandle, the complaint alleges that Local 798 did a lot more. In addition to calling Panhandle at least twice with the same message it had for Vectren, Local 798 threaten to call OSHA and say that Kokosing wasn't following federal safety guidelines on the Panhandle site and was going to get someone killed, even though (according to the complaint) there wasn't any basis for making those accusations. Local 798 also published a public letter and leafletted flyers that encouraged the public to call Panhandle and protest the use of unskilled workers. Whether conduct is impermissibly coercive is primarily a fact-bound inquiry, and the alleged conduct is sufficient to state a plausible claim because the conduct could reasonably be expected to threaten Panhandle with ruin or substantial loss. Id. at 731-732; Donegal Servs., LLC v. Int'l Union of Operating Engineers, Loc. 150, AFL-CIO, 2020 WL 5994464, at *3 (N.D. Ill. Oct. 8, 2020); Printpack, Inc. v. Graphic Commc'ns Union Loc. 761-S, 988 F. Supp. 1201, 1204 (S.D. Ind. 1997).

Kokosing's second amended complaint undermines Local 798's argument that the court should dismiss Kokosing's Section 303 claim concerning conduct related to TransCanada based on the complaint's failure to allege actual

damages. The second amended complaint alleges actual damages incurred from conduct related to TransCanada that the first amended complaint omitted. (Second Am. Compl. ¶ 35). Local 798's argument regarding TransCanada is therefore moot.

## 2.  *Count 1— 29 U.S.C. § 158(b)(4)(ii)(A)*

Subsection 158(b)(4)(ii)(A) makes it an unfair labor practice for a labor union "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is forcing or requiring any employer to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e)." Subsection (e) prohibits so-called "hot-cargo" or "union-signatory" agreements that occur when a union and an employer enter into an agreement whereby the employer "ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person . . . ." 29 U.S.C. § 158(e). But Subsection (e) also contains an "on-site" exception that allows union-signatory agreements if they are "between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done *at the site* of the construction, alteration, painting, or repair of a building, structure, or other work . . . ." 29 U.S.C. § 158(e) (emphasis added).

Local 798's proposed collective bargaining agreement[1] requires that all covered work be done by employees who acquire Local 798 membership by the eighth day of their employment. (Second Am. Compl. Ex. 1, at 11 (Art. III, § C)). Section L of the agreement requires that all work covered by the agreement be performed in accordance with the agreement, regardless of whether the work is done by Kokosing or a subcontractor of Kokosing. (Id. at 9 (Art. I, § L)). These two provisions together would appear to preclude Kokosing from using subcontractors to perform covered work who don't use Local 798 members.

Count 1 of the complaint alleges that the agreement violates § 158(e) and doesn't fall within the on-site exception because it broadly defines covered work by including provisions that require Kokosing subcontractors to only use Local 798 members when performing off-site work. Kokosing cites two sections of the Local 798's proposed collective bargaining agreement for support. First, Kokosing cites Article I, Section E, which reads:

> (E)     Fabrication and installation of all launchers, receivers and appurtenant piping and related facilities on mainline pipe lines including those portions within private property boundaries which are an integral part of the pipe line system. Employer shall have the right to perform all fabrication work on mainlines or pumping stations under either (1) the terms and conditions of this Agreement, or (2) in a permanent fabrication shop under the terms and conditions of the National Minimum Standard Agreement for a Commercial Pipe Fabricating Shop. All fabrication performed in a permanent fabrication shop must carry the United Association Union label.

---

[1] The collective bargaining agreement was attached to the complaint. "When ruling on a motion to dismiss, the court may consider documents attached to the complaint . . . ." Amin Ijbara Equity Corp. v. Vill. of Oak Lawn, 860 F.3d 489, 493 (7th Cir. 2017).

Kokosing says that fabrication is prototypical off-site work that doesn't fit within the on-site exception.

Second, Kokosing cites Article I, Section M, which reads:

(M)    In order to preserve work customarily performed by Employees working under this Agreement, it is agreed that, as a primary working condition, all double-jointing and rebevelling of pipe shall be performed by an Employer bound to this Agreement, except as otherwise mutually agreed upon in writing by the Union and the PLCA with relation to any particular job or project. It is further agreed that no subterfuge shall be used to avoid the intent and scope of this provision and this Agreement shall apply to all firms, corporations or contractors owned financed or in any way controlled by an employer bound by this Agreement.

Kokosing says this section violates § 158(e) because it prohibits Kokosing from subcontracting the rebevelling and double-jointing of pipe to subcontractors who don't use Local 798 members when the work is performed off-site.

Local 798 says that § 158(e) only proscribes provisions if they are "secondary" in nature, and neither Sections E nor M are because they were designed to preserve work for its members.

Irrespective of the on-site exception, "[w]hether a contractual provision limiting an employer's subcontracting choice to union signatories is enforceable under § 158(e) depends on whether the union's motivation stems from primary or secondary objectives." Moriarty v. Svec, 55 F. Supp. 2d 876, 881 (N.D. Ill. 1999) (citing National Woodwork Manuf. Assoc. v. NLRB, 386 U.S. 612, 644-645 (1967); NLRB v. Chauffeurs, Teamsters, Warehousemen & Helpers Local 525, 773 F.2d 921, 924 (7th Cir. 1985)). Section 158(e) "prohibits only agreements calculated to satisfy 'secondary' objectives." NLRB v. Chauffeurs, Teamsters, Warehousemen & Helpers Local 525, 773 F.2d at 924 (internal quotations

13

omitted). "When a union's objective is the preservation of work for its member, a primary objective, then a union signatory clause is enforceable." Moriarty v. Svec, 55 F. Supp. 2d at 881 (citing National Woodwork Manuf. Assoc. v. NLRB, 386 U.S. at 645; NLRB v. Chauffeurs, Teamsters, Warehousemen & Helpers Local 525, 773 F.2d at 924). But when provisions "are tactically calculated to satisfy union objectives elsewhere[,]" they are secondary and unenforceable. Nat'l Woodwork Mfrs. Ass'n v. N. L. R. B., 386 U.S. 612, 644 (1967).

"Generally '[a]greements which limit the employer . . . to subcontracting with businesses that recognize the union or have a union contract violate [§ 158(e)].'" NLRB v. Chauffeurs, Teamsters, Warehousemen & Helpers Local 525, 773 F.2d at 924 (quoting Building Material and Dump Truck Drivers, Teamsters Local Union No. 36 v. NLRB, 669 F.2d 759, 764 (D.C. Cir. 1981), aff'd on other grounds sub nom. Shepard v. NLRB, 459 U.S. 344 (1983)); Moriarty v. Svec, 55 F. Supp. 2d at 881 ("[Clauses] intended to coerce non-union workers to join the union, or non-union business to use union members, are illegitimate and unenforceable."). "[U]nion signatory clauses . . . focus on the union affiliation of . . . a subcontractor's employees. They are presumptively invalid." Id. (internal citations omitted). Such provisions are secondary in nature because they have a secondary purpose: "the unionization of the independent contractors." Id.

Local 798 says Section (E) of the agreement is primary in nature because it gives Kokosing the right to do its fabrication either on-site or in its own permanent fabrication shop—provided that the fabrication shop is party to a different collective bargaining agreement. But the provision actually gives

Kokosing the option to do its fabrication "under either (1) the terms and conditions of this Agreement, or (2) in a permanent fabrication shop under the terms and conditions of the National Minimum Standard Agreement for Commercial Pipe Fabrication Shop." (Second Am. Compl. Ex. 1, at 8 (Art. I, § E)). The first option would require any fabrication subcontractors to use Local 798 members. If any of the fabrication work is performed off-site, then Section (E) would violate § 158(e) because it would restrain Kokosing from doing business with those subcontractors and wouldn't fall within the on-site exception. The second option requires fabrication subcontractors to have their own collective bargaining agreement with Local 798. Either way, the Section (E) has the secondary purpose of effectuating the unionization of Kokosing subcontractors. It's therefore invalid. Id. ("[T]he vice in the disputed clauses here is that they condition subcontracting out work solely on the basis of union membership.").

Regarding Section (M), Local 798 says that it is a work preservation clause because it seeks to preserve work customarily performed by employers covered by the agreement. But the provision suffers from the same deficiency as Section (E). Section (M) requires all double-jointing and rebevelling of pipe "be performed by an Employer bound to this Agreement . . ." and that the "Agreement shall apply to all firms, corporations or contractors owned, financed or in any way controlled by an employer bound to this Agreement." This would require double-jointing or rebevelling subcontractors to use Local 798 members. That's a secondary purpose and is invalid.

*   *   *

Kokosing has sufficiently alleged a violation of 29 U.S.C. § 158(b)(4)(ii)(A) in Count 1 of the complaint.

### 3. *Count 2— 29 U.S.C. § 158(b)(4)(ii)(B)*

Subsection 158(b)(4)(ii)(B) "bars certain labor activity against a secondary target." 520 S. Michigan Ave. Assocs, Ltd. v. Unite Here Loc. 1, 760 F.3d at 718. The statute makes it an unfair labor practice for a labor union "to threaten, coerce, or restrain any person engaged in commerce where an object thereof is . . . forcing or requiring any person to cease . . . doing business with another person . . . ." 29 U.S.C. § 158(b)(4)(ii)(B). To state a claim under Subsection 158(b)(4)(ii)(B), Kokosing must allege that (1) Local 798 coerced at least one neutral target, (2) Local 798 used coercion with the intent of forcing the neutral party not to do business with Kokosing, (3) the targeted neutral party ceased or reduced its business with Kokosing, (4) the neutral party's decision was caused by Local 798's conduct, and (5) Kokosing was damaged by the neutral party's decision. 520 S. Michigan Ave. Assocs, Ltd. v. Unite Here Loc. 1, 760 F.3d at at 725.

Local 798 argues that the complaint doesn't plausibly allege that Local 798 coerced either Vectren or Panhandle, nor does the complaint allege that Vectren, Panhandle, or TransCanada ceased or reduced doing business with Kokosing. But, as already determined, Kokosing has sufficiently alleged coercive conduct regarding Local 798's actions involving Panhandle, but not Vectren. And

Kokosing sufficiently alleged Vectren, Panhandle, and TransCanada ceased or reduced doing business with it. (Second Am. Compl. ¶¶ 36, 38, 46, 47, 53, 58).

Local 798 also argues that the complaint doesn't allege that Kokosing sustained any damages from TransCanada's decisions because the complaint's only basis for damages is Kokosing's lost opportunity to bid on future TransCanada work. They cite Matson Plastering Co. Inc. v. Plasterers and Shop Hands Local No. 36 in saying that such damages are too speculative and can't be recovered in a Section 303 claim. 852 F.2d 1200, 1203 (9th Cir. 1988).

The Ninth Circuit in Matson Plastering Co. Inc. v. Plasterers and Shop Hands Local No. 36 held that "[b]ecause Matson did not bid on . . . subsequent contracts, we hold that any damages resulting from its lost opportunities are not available under section 303." Id. But at least one other circuit court has disagreed. Fid. Interior Constr., Inc. v. Southeastern Carpenters Reg'l Council of the United Bhd. of Carpenters and Joiners of Am., 675 F.3d 1250, 1265 (11th Cir. 2012). And the court of appeals in this circuit has stated—in the context of considering a Section 303 claim—that "[w]hile damages cannot be based on pure speculation or guesswork, . . . they also need not be proven with the certainty of calculus. . . . [When] uncertainty as to the damages stems from the defendants' illegal conduct, the defendants should not benefit from the uncertainty they created: 'Speculation has its place in estimating damages, and doubts should be resolved against the wrongdoer.'" BE & K Const. Co. v. Will & Grundy Ctys. Bldg. Trades Council, 156 F.3d 756, 770 (7th Cir. 1998) (quoting Mid–America Tablewares, Inc. v. Mogi Trading Co., Ltd., 100 F.3d 1353, 1365 (7th Cir. 1996));

*see* Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931) ("The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."). *But cf.* J. Pease Const. Co. v. Loc. 150, Int'l Union of Operating Engineers, AFL-CIO, 1992 WL 77731, at *15 (N.D. Ill. Apr. 7, 1992) (holding that damages based on lost future bids aren't recoverable but declining to dismiss plaintiff's Section 303 claim because plaintiff may be able to prove damages based on lost sales).

The complaint alleges that after TransCanada informed Kokosing in September 2018 that it would no longer do business with Kokosing, Kokosing "sustained damages . . . in the amount of at least $19,298,400 in the years 2018, 2019, and 2020 based on estimated revenue of $4,000,000 in 2018, $73,900,000 in 2019, and $105,700,000 in 2020 with a 10.51% profit margin." (Second Am. Compl. ¶ 38). That is sufficient to allege a violation of Subsection 158(b)(4)(ii)(B).

\* \* \*

Kokosing has sufficiently alleged a violation of 29 U.S.C. § 158(b)(4)(ii)(B) in Count 2 of the complaint regarding Local 798's conduct involving Panhandle and TransCanada.

### 4.   *Count 3— 29 U.S.C. §  158(b)(4)(ii)(C)*

Subsection 158(b)(4)(ii)(C) makes it an unfair labor practice for a labor union "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing

or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of [29 U.S.C. § 159]."

Count 3 alleges Local 798's conduct forced and/or required Kokosing to recognize and/or bargain with Local 798 as the representative of its employees when another labor organization had already been recognized as the representative of such employees under the provisions of 29 U.S.C. § 159.

Local 798 argues that Count 3 of the complaint replaces the word "certified" as required by Subsection 158(b)(4)(ii)(C) with "recognized" and says this matters because it is well-settled that "under the NLRA, a binding bargaining relationship may be established between an employer and a labor union by one of two methods: NLRB certification pursuant to an election or voluntary recognition of the union by the employer." Lincoln Park Zoological Society v. NLRB, 116 F.3d 216, 219 (7th Cir. 1997). Therefore, certification as used in Subsection 158(b)(4)(ii)(C) only refers to the process of certification by the NLRB through election by the affected employees, but Count 3 speaks to the recognition of a collective bargaining representative instead.

Kokosing responds that there is no caselaw determining whether a union must be certified by the NLRB following an employee election for a Subsection 158(b)(4)(ii)(C) claim to stand. Kokosing nevertheless agrees to dismiss Count 3, so Count 3 will be dismissed without prejudice.

### 5. *Count 4— 29 U.S.C. § 158(b)(4)(ii)(D)*

Count 4 alleges that Local 798 violated subsection 158(b)(4)(ii)(D). The statute makes it an unfair labor practice for a labor union "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class . . . ."

Local 798 says that the complaint doesn't allege coercive conduct. It also says that the complaint doesn't sufficiently allege legally cognizable damages with respect to Local 798's actions involving TransCanada. But as already explained, the complaint alleges coercive conduct regarding Local 798's actions involving Panhandle and TransCanada, and it adequately pleads damages resulting from Local 798's actions involving TransCanada. So Kokosing has sufficiently alleged a violation of 29 U.S.C. § 158(b)(4)(ii)(B) in Count 4 of the complaint regarding Local 798's conduct involving Panhandle and TransCanada.

### B. *Count 5— State-law Defamation*

Counts 5 and 6 bring state-law claims; both parties seem to agree that Indiana law applies. Count 5 brings a claim for defamation alleging that Local 798 disseminated maliciously false statements that Kokosing uses unskilled, inexperienced, improperly trained welders that pose a safety risk and violate federal safety regulations; the statements are alleged to have been factual

statements that Local 798 knew to be untrue; Local 798 disseminated these statements with actual malice and reckless disregard as to whether the statements were false; and that Local 798's defamatory statements caused Kokosing damages.

Under Indiana law, "[t]o maintain an action for . . . defamation the plaintiff must demonstrate (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages." Kelley v. Tanoos, 865 N.E.2d 593, 596–597 (Ind. 2007). "Defamation is 'that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff.'" Miller v. Cent. Indiana Cmty. Found., Inc., 11 N.E.3d 944, 955 (Ind. Ct. App. 2014) (citing Davidson v. Perron, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999), trans. denied). "Any statement actionable for defamation must not only be defamatory in nature, but false. The determination of whether a communication is defamatory is a question of law." Id. (citing Trail v. Boys & Girls Clubs of Nw. Ind., 845 N.E.2d 130, 136 (Ind. 2006)).

"While defamation claims do not require parties to meet a heightened pleading standard, 'a plaintiff must still set out the operative facts,' including the allegedly defamatory statement, to properly assert a claim for defamation." Britt Interactive LLC v. A3 Media LLC, 2017 WL 2118513, at *5 (S.D. Ind. May 16, 2017) (citing Trail v. Boys & Girls Clubs of Nw. Ind., 845 N.E.2d 130, 136 (Ind. 2006)). "While the pleading does not need to incorporate the literal statement, a party asserting a defamation claim must provide some context as to when and how the allegedly defamatory statement was made 'to allow the defendant to form

an appropriate response.'" Id. (quoting Farr v. St. Francis Hosp. & Health Ctr., 2007 WL 2793396, at *4 (S.D. Ind. Sept. 26, 2007); Cowgill v. Whitewater Publ'g, 2008 WL 2266367, at *1 (S.D. Ind. May 29, 2008)).

"A defamatory communication is said to either be 'defamatory *per se*' or 'defamatory *per quod*.' A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct." Kelley v. Tanoos, 865 N.E.2d at 596. "In addition, the defamatory nature of the communication must appear without resort to extrinsic facts or circumstances." Miller v. Cent. Indiana Cmty. Found., Inc., 11 N.E.3d at 956. "All other defamatory communications are defamatory *per quod*." Kelley v. Tanoos, 865 N.E.2d at 596; *see also* McQueen v. Fayette Cty. Sch. Corp., 711 N.E.2d 62, 65 (Ind. Ct. App. 1999) ("Words not actionable in themselves may become actionable by their allusion to some extrinsic fact, or by being used and understood in a different sense from their natural meaning. . . . Such words are deemed actionable *per quod*, and they acquire a defamatory meaning when placed in context or are connected with extrinsic facts or circumstances.").

"Actions for *per se* and *per quod* defamation are susceptible to different requirements with regard to the showing of damages." Id. at 597. "Damages . . . may be presumed in an action for defamation per se as a natural and probable consequence of the per se defamation." Miller v. Cent. Indiana Cmty. Found., Inc., 11 N.E.3d at 956 (internal quotations omitted). But the plaintiff must plead

22

special damages in an action for defamation per quod. Kelley v. Tanoos, 865 N.E.2d at 597.

Local 798 attacks Count 6 with several arguments. First, Local 798 argues that Count 6 doesn't state a claim for either defamation per se or per quod because it didn't allege the defamatory statement and thus lacks the required specificity to state the claim. But the complaint "does not need to incorporate the literal statement[,]" it only needs to "provide some context as to when and how the allegedly defamatory statement was made to allow the defendant to form an appropriate response." Britt Interactive LLC v. A3 Media LLC, 2017 WL 2118513, at *5 (internal quotations omitted). The complaint satisfies this requirement. (Second Am. Compl. ¶¶ 40, 49, 51, 52, 59, 60, 61, 64, 66, 67, 68, 69).

Second, Local 798 argues that the alleged defamatory statements aren't defamation per se because they were rhetorical hyperbole and opinion. "For a statement to be actionable as defamation per se, it must be clear that it contains objectively verifiable fact regarding the plaintiff. If the speaker is merely expressing his subjective view, interpretation, or theory, then the statement is not actionable." Wartell v. Lee, 47 N.E.3d 381, 385 (Ind. Ct. App. 2015) (internal quotations omitted).

Rhetorical hyperbole "is a well-recognize category of . . . privileged defamation." Dilworth v. Dudley, 75 F.3d 307, 309 (7th Cir. 1996) (citing cases). "It consists of terms that are either too vague to be falsifiable or sure to be understood as merely a label for the labeler's underlying assertions; and in the

latter case the issue dissolves into whether those assertions are defamatory. If you say simply that a person is a 'rat,' you are not saying something definite enough to allow a jury to determine whether what you are saying is true or false. If you say he is a rat because …, whether you are defaming him depends on what you say in the because clause." Id.

"Opinions, too, are sometimes determined to be outside the reach of a defamation claim. An opinion is not actionable if it does not contain any provably false factual assertions." Pierson v. Nat'l Inst. for Lab. Rels. Rsch., 319 F. Supp. 3d 1100, 1109 (N.D. Ind. 2018) (citing Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, n. 7 (1990)); see also Sullivan v. Conway, 157 F.3d 1092, 1097 (7th Cir. 1998) (holding that the statement "[plaintiff] is a very poor lawyer" was unactionable because it didn't convey a verifiable falsehood like the statement "[plaintiff] lost every case he has tried" would have). For example, in Indiana, statements by an employee's supervisor that she was "stealing time," working on a scheme with her boss to defraud the company, and stealing an air compressor from the company constitute defamation per se because they imputed misconduct in the employee's profession. Dugan v. Mittal Steel USA Inc., 929 N.E.2d 184, 187 (Ind. 2010). "The court reached this conclusion relying solely on the statements, without reference to any extrinsic evidence, while reasoning that the statements were not subjective opinion but objectively verifiable defamatory facts." Yeatts v. Zimmer Biomet Holdings, Inc., 2019 WL 285191, at *6 (N.D. Ind. Jan. 18, 2019), aff'd, 940 F.3d 354 (7th Cir. 2019) (analyzing the Dugan decision).

Many of the complaint's alleged defamatory statements are Local 798's remarks that Kokosing uses unskilled, unqualified, and untrained workers, or that Kokosing couldn't deliver safe and quality work. These statements aren't defamatory because they express Local 798's subjective opinions and don't contain objectively verifiable facts regarding Kokosing. But the complaint also alleges that Local 798 said that Kokosing was violating federal safety standards. (Second Am. Compl. ¶¶ 40, 66, 67). These statements would "tend to injure reputation or to diminish esteem, respect, good will, or confidence" in Kokosing, Miller v. Cent. Indiana Cmty. Found., Inc., 11 N.E.3d at 955, and impute misconduct in Kokosing's profession, *see* Dugan v. Mittal Steel USA Inc., 929 N.E.2d at 187. The court also doesn't need to resort to extrinsic facts to understand the defamatory nature of the communication. Miller v. Cent. Indiana Cmty. Found., Inc., 11 N.E.3d at 956. Based on these statements, Count 6 has stated a claim for defamation per se.

Finally, Local 798 says that Count 6 fails to state a claim for defamation per quod because Kokosing failed to plead special damages. "A plaintiff pleading special damages due to defamation . . . must plead and demonstrate that the special damages were incurred as a natural and proximate consequence of the wrongful act." State Farm Fire & Cas. Co. v. Radcliff, 987 N.E.2d 121, 153 (Ind. Ct. App. 2013) (quoting N. Ind. Pub. Serv. Co. v. Dabagia, 721 N.E.2d 294, 304 (Ind. Ct. App. 1999), reh'g denied, trans. denied). But the complaint did plead special damages. (Second Am. Compl. ¶¶ 35, 38, 47, 58, 104). So Count 6 has stated a claim for defamation per quod.

C. *Count 6—State-law Interference with Business Relationships and*
*Expectancies*

Count 6 brings a claim for tortious interference with business relationships and expectancies, alleging that Kokosing had on-going business relationships with companies in the pipeline industry, Local 798 was aware of those relationships, Local 798's conduct interfered with those relationships, Local 798 acted without justification, and Kokosing sustained damages as a result. Count 6 also alleges that Local 798's conduct in making intentionally false statements is illegal conduct that is actionable interference.

"In Indiana, tortious interference with business relationships consists of five elements: (1) the existence of a valid business relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference in the relationship; (4) the absence of any justification; and, (5) damages resulting from the defendant's interference. Harvest Live Ins. v. Getche, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998) (internal citation omitted). "[A]n element necessary to prove this cause of action is that a defendant acted illegally in achieving his end." Watson Rural Water Co. v. Indiana Cities Water Corp., 540 N.E.2d 131, 139 (Ind. Ct. App. 1989); *see also* Brazauskas v. Fort Wayne-S. Bend Diocese, Inc., 796 N.E.2d 286, 291 (Ind. 2003) ("[T]his tort requires some independent illegal action."); Levee v. Beeching, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000) ("[I]llegal conduct is an essential element of tortious

interference with a business relationship.").[2] Local 798 challenges Count 6 by arguing that it doesn't sufficiently allege illegal conduct.

"Indiana case law provides little guidance on what constitutes illegal conduct for purposes of establishing a tortious interference with a business relationship claim." Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., 388 F. Supp. 2d 919, 931 (S.D. Ind. 2005). "Nearly all the cases have been decided on motions to dismiss and because of that procedural posture, guidance on what can constitute 'illegal' conduct is virtually nonexistent." CDW LLC v. NETech Corp., 2013 WL 786448, at *7 (S.D. Ind. Feb. 7, 2013). However, "'courts interpreting Indiana law have held that non-criminal illegal acts are sufficient' to establish a tortious interference with a business relationship claim . . . .'" Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., 388 F. Supp. 2d at 931 (quoting Syndicate Sales, Inc. v. Hampshire Paper Corp., 192 F.3d 633, 641–642 (7th Cir. 1999) (citing cases)). Courts have also held that common law fraud can satisfy the illegal conduct element. CDW LLC v. NETech Corp., 2013 WL 786448, at *7 (citing Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., 388 F. Supp. 2d at 931-932). But a claim for defamation is insufficient to establish the illegal conduct element. Levee v. Beeching, 729 N.E.2d at 222-223.

Kokosing says that it sufficiently alleged illegal conduct through "allegations suggesting possible fraud" because they made "allegations suggesting fraudulent comments . . . ." (Resp. at 22). But neither the compliant

---

[2] Kokosing argues that Indiana law doesn't rigidly require an illegal act to support a claim for tortious interference with business relationships. But Indiana caselaw makes it clear that an element of this cause of action is that the defendant acted illegally.

nor Kokosing's response brief show how Local 798's conduct satisfies the elements of common law fraud under Indiana law. The complaint doesn't bring a claim for fraud, to be sure. Pleadings that merely offer "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. at 678. The complaint needs to allege with greater particularity conduct constituting Indiana common law fraud (or some other illegal conduct) to sufficiently plead the illegality requirement for tortious interference with business relationships.

Kokosing's Section 303 claims in counts 1, 2, and 4 can't satisfy the illegality requirement for tortious interference with business relationships because state-law claims that turn on conduct that constitutes an unfair labor practice under 29. U.S.C. § 158(b) are preempted. San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon, 359 U.S. 236, 245 (1959). ("When an activity is arguably subject to s 7 or s 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."). A limited exception to that general rule exists "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [it] could not [be] infer[red] that Congress had deprived the States of the power to act." Id. at 244. "Specific examples have been found to include those cases where the conduct involved acts of physical violence or concerted conduct imminently threatening violence." Park Elec. Co. v. Int'l Bhd. of Elec. Workers, Loc. 701, AFL-

CIO, 540 F. Supp. 779, 782 (N.D. Ill. 1982) (citing cases). But this case doesn't fit the exception.

Accordingly, Count 6 of the complaint is dismissed with prejudice because it fails to state a claim upon which relief can be granted.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Local 798's motion to dismiss the second amended complaint [Doc. No. 35]. The court GRANTS Local 798's motion with respect to Count 3 and Count 6. Count 3 is DISMISSED WITHOUT PREJUDICE and Count 6 is DISMISSED WITH PREJUDICE. The court DENIES Local 798's motion in all other respects.

SO ORDERED.

ENTERED: <u>September 15, 2021</u>

 /s/ Robert L. Miller, Jr.
Judge, United States District Court

Distribution: All electronically registered counsel of record